Filed 11/17/14  P. v. McPherson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049282 |
| v. | (Super. Ct. No. 12NF1244) |
| BARRY ROBERT MCPHERSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Daniel Barrett McNerney, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael Joseph Benke, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Barry Robert McPherson of one count of oral copulation or sexual penetration with a child who is 10 years of age or younger, in violation of Penal Code section 288.7, subdivision (b) (section 288.7(b)).[1] After denying McPherson's motion for a new trial, the trial court sentenced him to a prison term of 15 years to life, as mandated by section 288.7(b).

McPherson contends (1) the trial court abused its discretion by denying his motion for a new trial made under section 1181, subdivision 8; (2) the sentence of 15 years to life in prison mandated by section 288.7(b) violates federal and state constitutional prohibitions on cruel and unusual punishment; and (3) the mandatory sentence of 15 years to life in prison under section 288.7(b) violates federal and state constitutional guarantees of equal protection of the law. We disagree with each contention and therefore affirm.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

## I. Acts Constituting the Crime

In 2011, seven-year-old P.H. lived in Yorba Linda with her parents M.H. and J.H. McPherson and his wife, S.M., had lived next door to M.H. and J.H. for 20 years. M.H. felt comfortable leaving P.H. in McPherson's care: P.H. referred to McPherson as "Grandpa Rob" (some capitalization omitted) and his wife as "Grandma S[.M.]" (some capitalization omitted).

---

[1] All code references are to the Penal Code.

At about 5:45 p.m. on September 15, 2011, M.H. took P.H. over to McPherson's house and asked McPherson and S.M. to babysit P.H. for an hour to an hour and a half. While at McPherson's home, P.H. helped McPherson wash his two dogs in an upstairs shower. S.M. remained downstairs and prepared dinner. McPherson's two grandchildren, who were four and five years old, were in an upstairs bedroom across the hall from the bathroom in which the dogs were washed.

After the dogs ran downstairs, McPherson locked the master bedroom door and had P.H. lie on the bed with her legs hanging off the end. With his knees rested on the ground, McPherson pulled down P.H.'s pants and licked her vagina. He also licked her breasts and buttocks. McPherson told P.H. that he "did this to S[.M.] when they were married." He made P.H. promise not to tell anyone about what had happened.

McPherson unlocked the bedroom door and he and P.H. returned downstairs and ate dinner with S.M. P.H. did not tell S.M. about what McPherson did because P.H. thought S.M. would be angry. At about 7:15 p.m., M.H. and J.H. arrived to pick up P.H., who was sitting on McPherson's lap while McPherson played guitar. P.H. wanted to stay and play guitar, but M.H. told her they had to go home.

## II. P.H. Reports the Crime.

Once home, P.H. asked M.H. to carry her upstairs to get ready for bed. The manner in which P.H. made that request seemed unusual. M.H. carried P.H. upstairs and had her undress to take a shower. P.H. undressed and placed her clothing—pink Capri pants, a black top, and underwear—on the floor. In the bathroom, as M.H. started the shower, P.H. sat on the toilet and said that "Grandpa Rob" had licked her private part.

After telling P.H. to get in the shower, M.H. ran downstairs to tell J.H. what P.H. had said. J.H. became angry and started to shout. M.H. ran back upstairs, pulled P.H. from the shower, and put a robe on her. J.H. went to talk to a neighbor, Linda

3

Vosberg, who came upstairs to talk with P.H. P.H. told Vosberg that McPherson licked her "coochy," meaning her vagina.

### III. Examination and Investigation

Vosberg contacted the Orange County Sheriff's Department. Orange County Deputy Sheriff Juan Arciniega responded. Wearing gloves, he collected P.H.'s clothing from the floor and put the clothing into a department-issued evidence bag. He took the bag to a hospital in Anaheim, where registered forensic nurse Jan Hare took custody of it. Wearing gloves, she removed the clothing, bagged each article of clothing individually, and collected all the bags into a larger evidence bag. M.H. took P.H. to the same hospital for a sexual assault examination.

During the examination, Hare took swabs of P.H.'s cheek, mouth, abdomen, vulva, vestibule area, neck, navel, and inner thigh area. Hare sealed and identified the swabs. She examined P.H. for injuries but found none.

On September 16, social worker Sunday Petrie conducted an audio-visually recorded Child Abuse Services Team (CAST) interview of P.H. A DVD of the CAST interview was played for, and a transcript published to, the jury.[2] During the interview, P.H. said that McPherson pulled down her pants and underwear and licked the outside and inside of her vagina. McPherson then kissed her on the mouth, pulled down the top of her shirt, and licked her breasts. He told P.H., "[t]his is our little secret" and not to tell anyone about what he had done. McPherson stopped orally copulating P.H. when S.M. called from downstairs to announce that dinner was ready.

P.H.'s family moved from the home in which M.H. had lived for 34 years. Several weeks later, P.H. wrote in chalk on the patio in front of her home: "I hate Rob. I hate living here. Why did he do this? Why do we have to move?"

---

[2] The transcript of the CAST interview later was received in evidence as trial exhibit No. 4B.

4

## IV.  Expert Testimony and Scientific Evidence

Forensic scientist Corrie Maggay analyzed DNA obtained from P.H. during the sexual assault examination and from clothing P.H. wore on September 15, 2011.  At some point, a DNA sample had been taken from McPherson at the Orange County crime laboratory.

The samples taken from P.H. were screened for seminal fluid and amylase, which is an enzyme found in high amounts in saliva and other bodily fluids.  Swabs taken from the inner thigh, abdomen, and vulva tested negative for semen and amylase.  No foreign DNA was found on the swabs taken from the vulva, cheek, abdomen, or thighs.  Swabs from the anal area and vestibule area tested negative for semen, but had a slight reaction with amylase.  Very low levels of amylase were also detected on the neck sample.  DNA analysis indicated the neck sample contained a mixture of three contributors—a major, minor, and trace contributor.  DNA testing was not performed on the vestibular swab because no foreign DNA was found on the vulva swab, and the analyst believed P.H.'s DNA would overwhelm the DNA of any minor contributor.

DNA was extracted from the front inside waistband and back inside waistband of P.H.'s underwear.  Using fluorescence, Maggay found four stains on the inside waistband of the underwear.  She circled the stains and labeled them A through D.  Stains A, B, and C were on the front inside of the underwear, and stain D was on the back inside of the underwear.  Using sterile razors, Maggay cut samples of the stained fabric for amylase testing.  A "low level of amylase" was found on all four stains.  Maggay sent the stain with the highest level of amylase (stain B) to be tested for DNA.  Stain B was excised from the part of the underwear "that goes to the thigh between the vaginal area and the thigh."  Testing confirmed the presence of DNA on stain B from a single source: P.H.

Two months later, Maggay conducted a second test for amylase on the inside area of the underwear.  (The underwear had been stored in a freezer between the

5

first and second tests for amylase.) She labeled areas likely to contain the most amylase as areas 1, 2, and 3 to distinguish them from stains A, B, C, and D. Areas 1 and 2 reacted the most to amylase testing, and both areas had a mixture of DNA from two people. Area 1 had "a major female profile" identifiable as P.H., and a "minor profile" that could not be determined. Area 2 had DNA contributed from P.H. and from a second source. The DNA from the second source was compared to the DNA sample taken from McPherson. Based on the comparison, Maggay testified that McPherson "could not be excluded as the second contributor to the DNA profile." Area 2 was near the left "leg hole area next to the cro[t]ch" of the underwear near the "inner leg vaginal area."

Maggay explained that the term "cannot be excluded" in the case of area 2 meant the DNA profile deduced from the second contributor is "rarer than 1 in 1 trillion unrelated individuals." That is, the second DNA profile from area 2 is present in fewer than one out of one trillion people, and McPherson could not be excluded as that one person.

McPherson's trial counsel cross-examined Maggay on the subject of transference of DNA. Maggay explained that primary transfer of DNA can occur when, for example, a hand touches a water bottle: DNA from the hand is transferred to the water bottle. She testified that secondary and tertiary transfer of DNA was also possible. Secondary transfer might occur if the water bottle in the previous example was rubbed on a counter: DNA from the hand might be transferred to the bottle and then from the bottle to the counter. Tertiary transfer would occur if the DNA on the counter were transferred to another object, such as an elbow placed on the counter. Maggay testified tertiary transfer was "possible but unlikely." Nonetheless, she admitted inadvertent contamination of DNA samples has occurred in laboratories under "the most pristine conditions." On a prior occasion, unrelated to this case, an analyst's DNA was transferred to a DNA sample at the Orange County crime laboratory. Maggay also

testified that DNA can be transferred by spittle during conversation and that DNA can transfer easily when skin is wet.

### V. Defense Evidence

McPherson testified. He had known P.H. her entire life and denied ever molesting her. He denied the accusations: He denied that P.H. was ever on the bed in the master bedroom on September 15, 2011; he denied licking her vagina, buttocks, or breasts; and he denied touching her in any sexual fashion.

McPherson testified that when P.H. arrived at his home on September 15, she jumped on his lap, gave him a hug and a kiss, and said, "hi Grandpa." He gave her a hug and a kiss. McPherson and S.M. decided that he would wash their two dogs while she prepared dinner. P.H. volunteered to help wash the dogs and followed McPherson and the dogs upstairs to the bathroom adjoining the master bedroom. McPherson testified he did not close the door to the master bedroom. He put the dogs in the shower and stepped inside with them. P.H. stood outside the shower. McPherson turned the shower on and, after waiting for the water temperature to adjust, handed the shower wand to P.H with the instruction to hold it. P.H. stood with one foot inside the shower. McPherson rested on his knees while washing the dogs.

After washing the dogs, McPherson handed one to P.H. to hold, but the dog wriggled out of her hands and ran downstairs. McPherson yelled to S.M. to catch the dog and P.H. ran downstairs with a towel. McPherson grabbed the other dog, wrapped it in a towel, and ran downstairs. S.M. dried one dog, while P.H. dried the other.

McPherson showered, changed his clothes, walked back downstairs, and made hot dogs. After dinner, McPherson played with P.H. by tickling her and blowing "raspberries" on her belly. McPherson testified, "she is a very loving kid and we are physically contacting each other all the time." They played for "5 or 10 minutes." After dinner, P.H. used the bathroom.

7

P.H. asked McPherson to teach her to play the guitar. He testified she sat on his leg while he showed her how to strum the guitar and play chords, and "[h]er face was right next to mine and I was leaning down showing her where to put her fingers." They played guitar together for about half an hour. When M.H. and J.H. arrived, P.H. said, "I want to stay. I'm having fun."

S.M. testified that P.H. hugged and kissed McPherson upon arriving at their home on September 15. McPherson and P.H. laughed and played for 10 or 15 minutes; He tickled her belly and blew raspberries on her side. McPherson then cooked some hot dogs for dinner. S.M. testified that after cooking the hot dogs, McPherson and P.H. went upstairs to wash the dogs. S.M. could hear water from the shower draining down a pipe in the wall. When S.M. heard McPherson say, "the dogs are coming down, catch them," she stepped into the hallway and saw the dogs running down the stairs, followed by P.H. and McPherson in pursuit. After eating dinner, P.H. sat on McPherson's lap while he showed her how to play a child's guitar. McPherson's face was next to P.H.'s cheek. When M.H. and J.H. arrived, P.H. did not want to go home.

## DISCUSSION

### I. The Trial Court Did Not Err by Denying McPherson's Motion for a New Trial.

A. *Background*

The jury convicted McPherson, as charged, of one count of oral copulation or sexual penetration with a child who is 10 years of age or younger, in violation of section 288.7(b). He moved for a new trial on the ground of newly discovered evidence which, he contended, refuted Maggay's testimony. Attached to the motion for a new trial as exhibit A was a document entitled "Opinion of Forensic Scientist: Dr. Elizabeth A. Johnson, PhD" (Johnson's Opinion Statement). McPherson argued Johnson's Opinion Statement showed: "[T]he DNA expert could not competently determine forensically the

8

manner in which any DNA arrived where it was found and all DNA findings highlighted in this case are consistent with non-sexual deposit through a myriad of innocent instruments, notably the hands of the alleged victim and (independently) the toilet seat of the Defendant's home."

According to Johnson's Opinion Statement, Johnson had reviewed police reports, evidence lists, sexual assault examination reports, documents provided by the Orange County crime laboratory (including laboratory notes and data of examinations and testing on physical evidence), and transcripts of the trial testimony of Maggay, Arciniega, Hare, S.M., and McPherson. Johnson did not conduct examinations or tests of her own.

Johnson's Opinion Statement made the following points:

1. Although low levels of amylase activity were detected in the vestibule swabs, external anal swabs, and cheek samples, no DNA foreign to P.H. was detected in those samples.

2. DNA foreign to P.H. was detected only in the neck swab, which contained a mixture of DNA from three sources. McPherson could not be excluded as a contributor; however, Johnson declared, "[t]his finding on an exposed area is not considered probative given the interactions that P[.H.] and McPherson had during the evening." (Underscoring omitted.)

3. The two methods of amylase testing performed by the Orange County crime laboratory "are not specific for human salivary amylase though a specific test is available to crime laboratories."

4. No Y chromosome (unique to males) was detected in the sample taken from the back waistband of the underwear. Also, "many of the alleles that McPherson possesses were not detected."

5. A significant amount of water was applied during the "mapping procedure" for the sample taken from the inside of P.H.'s underwear, and, as a

9

consequence, amylase present on the outside surface would have diffused through the fabric and into the test paper. Johnson declared it therefore "is not possible to determine whether the enzyme activity originates from the inner or outer surface of the underwear."

6. DNA testing on area 1 of the underwear showed that only P.H. contributed DNA at reportable levels. Although trace amounts of foreign alleles were detected, the levels were below the laboratory's reporting threshold levels and too low to account for the amylase activity observed in the sample.

7. Johnson was aware of documented instances of "contamination of evidence samples with DNA of analysts who processed a case and with DNA of former staff members who were not present when the evidence was processed." Testing conducted by the Orange County crime laboratory could not determine how McPherson's DNA ended up on the underwear samples.

Johnson stated: "Had I been called to testify at trial I would have pointed out the discrepancies between the [Orange County crime laboratory] report and their [*sic*] data—in fact no DNA foreign to P[.H.] was detected at the lab's reporting threshold for area 1 of the underwear, and since no Y chromosome was detected in the back waistband sample no conclusion should have been made with respect to McPherson. I would also have emphasized that testing for amylase on this evidence does not confirm the presence of saliva, and areas that tested positive for amylase did not reveal a foreign DNA donor. Even if amylase were of sufficient quantity and specificity to indicate saliva[,] DNA testing cannot establish which of multiple DNA donors could be a contributor of saliva. The testing performed in this case by the [Orange County crime laboratory] cannot determine how any cellular material foreign to P[.H.] was deposited on her underwear. These results do not suggest or confirm that cells which contained McPherson's DNA were deposited on her underwear through an act of oral copulation of her genitals. The same result could be observed if P[.H.] had some of McPherson's nucleated cells on her hands and touched her genital area or underwear. Cells from McPherson could have been

10

transferred from a toilet seat or other bathroom fixture to her underwear.  The testing performed cannot establish the method or time of the deposit of cellular material and DNA onto the underwear."

The trial court denied the motion for a new trial.  The court stated: "Ms. Johnson takes issue with whether or not Ms. Maggay is qualified to render her opinion regarding triple or quadruple transfer of DNA from a mouth to the stomach, to a T-shirt, to underwear.  And I don't find that the opinion of Ms. Johnson, with respect to the qualifications of Ms. Maggay to offer her opinion, to be newly discovered evidence that would probably result—lead to a different result if it were offered in a new trial."

B.  *Legal Standards*

A trial court may grant a new trial motion "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial."  (§ 1181, subd. 8.)  In ruling on a motion for a new trial based on newly discovered evidence, the trial court considers (1) the evidence, and not merely its materiality, must be newly discovered; (2) the evidence must not be merely cumulative; (3) the newly discovered evidence would render a different result probable on a retrial; (4) the party could not with reasonable diligence have discovered and produced the evidence at trial; and (5) the facts must be shown by the best evidence of which the case admits.  (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

A defendant meets his or her burden of establishing that a different result is probable on retrial by establishing that at least one juror would have voted to find him or her not guilty if the new evidence had been presented.  (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519-521 (*Soojian*).)

An order denying a motion for a new trial based on newly discovered evidence is reviewed under the abuse of discretion standard.  (*People v. Musselwhite*

11

(1998) 17 Cal.4th 1216, 1251.)  We will reverse the trial court's denial of such a motion only on a showing of a manifest and unmistakable abuse of discretion.  (*Id.* at p. 1252.)

C.  *Johnson's Testimony Would Not Contradict the Prosecution's Strongest Evidence.*

In the motion for a new trial, McPherson did not present evidence on the fourth consideration; that is, "[he] could not with reasonable diligence have discovered and produced [Johnson's proposed testimony] at the trial."  (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328.)  On appeal, McPherson argues only that the trial court should have granted his new trial motion because Johnson's testimony would contradict the strongest evidence admitted against him.  He cites *People v. Martinez* (1984) 36 Cal.3d 816, 823 (*Martinez*), in which the California Supreme Court stated, "[n]umerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant."

In *Martinez*, *supra*, 36 Cal.3d at page 819, the defendant was convicted of second degree burglary.  The conviction was based on evidence that the defendant's palm print was found on a drill press stolen from a tool company.  (*Id.* at pp. 819-820.)  The defendant testified he frequently visited the tool company and on such visits sometimes touched the machines.  (*Id.* at p. 819.)  A plant maintenance man testified that in the evening before the burglary, he cleaned and painted the drill press, which would have covered any palm print left during one of these visits.  (*Ibid.*)  The maintenance man kept time records showing when he painted equipment but not which machine was painted on a particular day.  (*Ibid.*)

With his motion for a new trial, the defendant in *Martinez* produced an affidavit from a former foreman at the tool company, who declared the drill press had not been painted on the evening of the burglary, as the maintenance man testified, but had been painted no later than a day or two before the burglary.  (*Martinez*, *supra*, 36 Cal.3d at pp. 820-821.)  At a hearing on the new trial motion, the former foreman testified in

12

accordance with his affidavit. (*Id.* at p. 821.) The trial court denied the motion on the grounds the new evidence likely would not produce a different result on retrial and the defense had not used reasonable diligence in locating the foreman as a witness. (*Id.* at pp. 821, 822.)

The Supreme Court reversed the trial court. (*Martinez*, *supra*, 36 Cal.3d at p. 827.) The Supreme Court concluded it was reasonably probable the new evidence would have affected the outcome at trial because "[t]he prosecution's case rested entirely on the palm print" and "[a] plausible, innocent explanation for defendant's palm print on the drill press would expose a serious gap in the prosecution's proof." (*Id.* at p. 822.) The testimony of the former foreman would contradict the testimony of the maintenance man on the issue of the date when the drill press was painted, which was the "crucial" issue. (*Id.* at p. 823.)

Although the Supreme Court concluded the defendant was not diligent in obtaining the foreman's testimony, the lack of diligence was not a sufficient basis to deny the new trial motion. "The requirement of diligence serves 'a public policy which demands that a litigant exhaust every reasonable effort to produce at his trial all existing evidence in his own behalf, to the end that the litigation may be concluded.' [Citations.] That policy, however, itself serves a more fundamental purpose—the determination of guilt and innocence. Loyal to that higher purpose, some California cases suggest that the standard of diligence may be relaxed when the newly discovered evidence would probably lead to a different result on retrial. [Citations.]" (*Martinez*, *supra*, 36 Cal.3d at p. 825, fn. omitted.) The court concluded the defendant had presented newly discovered evidence that would probably lead to a different result at retrial, and, therefore, "[r]eliance upon counsel's lack of diligence to bar defendant from presenting that evidence to a trier of fact would work a manifest miscarriage of justice." (*Id.* at p. 826.)

*Martinez* created a very narrow exception to the reasonable diligence requirement of section 1181, subdivision 8. (See *Soojian*, *supra*, 190 Cal.App.4th at

13

p. 516.) In *People v. Dyer* (1988) 45 Cal.3d 26 (*Dyer*), the California Supreme Court clarified its holding in *Martinez* and "distanced itself" from that opinion. (*Soojian*, *supra*, at p. 516.) After discussing the facts and holding of *Martinez*, the *Dyer* court stated: "At no time, however, did we indicate [in *Martinez*] that a defendant is entitled to a new trial whenever evidence that was not presented at a previous trial is sought to be offered on retrial. The evidence generally *must* be newly discovered." (*Dyer*, *supra*, at p. 52.) The *Dyer* court noted that in *Martinez* the prosecution's case was "extremely weak" and, unlike *Martinez*, the defendant had failed to demonstrate the evidence, even if newly discovered, would change the result on retrial. (*Dyer*, *supra*, at p. 52.)

Johnson's testimony does not come within the narrow *Martinez* exception because it would not have contradicted the strongest evidence introduced against McPherson. The purpose of Johnson's testimony would have been to refute Maggay's testimony. The prosecution's strongest evidence was not Maggay's testimony, but was the testimony of P.H., M.H., Vosberg, and the recorded CAST interview. P.H. testified clearly and directly that McPherson orally copulated her and licked her breasts while she lay on the bed in the upstairs bedroom. P.H. complained of the abuse to M.H. soon after they returned home. (See *People v. Brown* (1994) 8 Cal.4th 746, 759-760 [evidence that victim promptly reported alleged abuse may be relevant to aid the jury in determining whether abuse occurred].) Soon thereafter, P.H. told Vosberg that McPherson kissed her vagina. In the CAST interview, P.H. said that McPherson "pulled down [her] pants and started licking [her] private part," then licked the "outside and the inside" of her vagina, kissed her on the mouth, pulled down the top of her shirt, and licked her breasts.

Johnson's testimony would not have contradicted that evidence and would not have exonerated McPherson. As the Attorney General argues, Johnson's Opinion Statement "disputes the *conclusiveness* of Maggay's testimony and laboratory analysis of DNA evidence, it does not claim that DNA evidence is *inconsistent* with P[.H.]'s testimony."

14

McPherson attempts to discredit P.H.'s testimony as that of a "very young child" who had "adopted some false memories" and had "transposed certain memories." Indeed, there are some errors in P.H.'s testimony and statements in the CAST interview, for example, that she had a "boo-boo" on her knee on the day of the incident and that she had placed her clothing in a hamper, but such errors are tangential to the crucial issues. On those crucial issues—whether McPherson orally copulated her, kissed her, and licked her breasts—P.H.'s testimony and statements in the CAST interview were reasonably consistent, and were consistent with the testimony of M.H., Vosberg, and Hare.

McPherson's reliance on *Soojian*, *supra*, 190 Cal.App.4th at pages 522-523, is misplaced, for, in that case, the extensive new evidence presented by the defendant contradicted most of the prosecution's evidence, including the victim's identification, and tended to show the defendant's cousin committed the crime. In addition, the prosecution failed to explain two glaring inconsistencies in the evidence. (*Id.* at p. 522.) The Court of Appeal held that "this is one of the rare cases where the failure to present evidence undermines confidence in the outcome, resulting in a miscarriage of justice." (*Id.* at p. 524.)

Johnson's testimony could have been discovered with reasonable diligence, and this was not a case, such as *Martinez*, in which such lack of diligence can be excused to prevent a manifest injustice. Here, the prosecution's case was not "extremely weak" (*Dyer*, *supra*, 45 Cal.3d at p. 52), and, unlike *Martinez*, the newly discovered evidence would not have contradicted the strongest evidence supporting the conviction.

We recognize the jury requested a readback of Maggay's testimony and soon thereafter returned a verdict. But McPherson's trial counsel extensively cross-examined Maggay and, in closing argument, argued to the jury the DNA evidence proved nothing and Maggay's testimony was flawed.[3] Further, "'[a] new trial on the

---

[3] McPherson's counsel argued: "There's no DNA foreign to P[.H.] on her vulva, on her cheek, on her abdomen or on her thighs—remember she took a shower—or on stain B

15

ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party." (*People v. Hall* (2010) 187 Cal.App.4th 282, 299.)  The only value of Johnson's testimony would be to impeach Maggay's testimony.  In the motion for a new trial, McPherson argued Johnson's expert testimony was necessary to "refute[] core evidence introduced by the People in rebuttal" and "to counter the People's [expert testimony]."

## II.  McPherson's Sentence of 15 Years to Life Does Not Constitute Cruel and Unusual Punishment Under the Federal Constitution or State Constitution.

A.  *Introduction and Standard of Review*

McPherson was sentenced pursuant to section 288.7(b), which imposes a mandatory punishment of 15 years to life in prison.[4]  He asserts this sentence constitutes

---

from the underwear. . . . [N]ot tested for DNA, not stain A, C, not the vestibule, not the pink pants or the black dress. . . ."  As for the DNA found on the waistband, counsel argued:  "The back waistband has a small amount [of DNA].  [¶]  How does Ms. Maggay swab the DNA?  She swabbed the front and back of the waistband a couple times and then she ran the sample.  How did she do area 2, the one that's got the big number? . . . We know about the kissing of the neck and everything else.  We did talk about that.  But this big number, 1 in 1 trillion, how did she do that?  She cut it out.  She didn't swab the inside of the underwear.  There's repeated question and argument from the inside of the underwear.  Where did the DNA come from the inside of the underwear?  That evidence doesn't support that it came from the inside of the underwear.  If you remember the testimony, Ms. Maggay cut it out and what does sample in area 2 contain?  It contains evidence from the inside and the outside of the underwear, does it not?  Because she cuts it out, it's got to have a front and back and they test it.  She doesn't know where on that underwear, of course, does it come from the—does it come towards the front?  Does it come[] from the edge?  And that's the only place.  [¶]  You take that evidence, you shake it up in a bag, you transport it, you dump it out, you cut it out, and it's had contact with other clothing that has . . . defendant's DNA all over it."

[4]  Section 288.7(b) states:  "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years

16

cruel and usual punishment prohibited under the United States Constitution and the California Constitution.  He argues the sentence of 15 years to life in prison for a single act of oral copulation on a child is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity.  "'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.'" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.)

B.  *United States Constitution*

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  For noncapital cases, the Eighth Amendment contains a proportionality principle, but it is "'narrow.'" (*Ewing v. California* (2003) 538 U.S. 11, 20.)  The appropriate standard for determining whether a particular sentence for a term of years violates the Eighth Amendment is gross disproportionality.  That is, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime. [Citations.]" (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. of Kennedy, J.), citing *Solem v. Helm* (1983) 463 U.S. 277, 288.)  Successful grossly disproportionate challenges are "'exceedingly rare'" and appear only in an "'extreme'" case.  (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73.)

The companion cases of *Ewing v. California* and *Lockyer v. Andrade* demonstrate the very narrowness of the Eighth Amendment's disproportionality principle.  Gary Ewing was sentenced to a term of 25 years to life under the California "Three Strikes" law for stealing three golf clubs priced at $399 each, as petty theft with a

of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

17

prior conviction for theft. (*Ewing v. California*, *supra*, 538 U.S. at pp. 18, 20.) The United States Supreme Court applied the principles of gross disproportionality and deference to legislative policy choices to conclude that Ewing's sentence of 25 years to life "is not grossly disproportionate and therefore does not violate the Eighth Amendment's prohibition on cruel and unusual punishments." (*Id.* at pp. 30-31.) Leandro Andrade was sentenced under California's Three Strikes law to two consecutive terms of 25 years to life on two counts of petty theft with prior theft-related convictions. (*Lockyer v. Andrade*, *supra*, 538 U.S. at p. 68.) On habeas corpus review, the United States Supreme Court rejected Andrade's claim that his sentence violated the prohibition against cruel and unusual punishment, holding "it was not an unreasonable application of our clearly established law for the California Court of Appeal to affirm Andrade's sentence of two consecutive terms of 25 years to life in prison." (*Id.* at p. 77.)

If terms of 25 years to life and 50 years to life are not "'grossly disproportionate'" (*Harmelin v. Michigan*, *supra*, 501 U.S. at p. 1001 (conc. opn. of Kennedy, J.) for petty theft with prior theft convictions, then McPherson's sentence of 15 years to life is not grossly disproportionate to the crime of oral copulation of a child and does not violate the Eighth Amendment to the United States Constitution.

C. *California Constitution*

1. *Relevant Law*

Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel or unusual punishment." A sentence violates this prohibition if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Dillon* (1983) 34 Cal.3d 441, 478.) A defendant has a "considerable burden" to show a punishment is cruel or unusual under the California Constitution. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) "The doctrine of separation of powers is firmly entrenched in the law of California, and a

18

court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment." (*Ibid.*) It is therefore only in the "'rarest of cases'" that a court may declare a punishment mandated by the Legislature to be "'unconstitutionally excessive.'" (*People v. Meneses* (2011) 193 Cal.App.4th 1087, 1093.)

We use a three-part test to determine whether a particular sentence is disproportionate to the offense for which it is imposed. First, we examine "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch* (1972) 8 Cal.3d 410, 425 (*Lynch*).) Second, we compare the punishment imposed with punishments prescribed by California law for more serious offenses. (*Id.* at pp. 426-427.) Third, we compare the punishment imposed with punishments prescribed by other jurisdictions for the same offense. (*Id.* at pp. 427-429.)

In applying the three-part test, we consider the "'totality of the circumstances'" surrounding the commission of the offense. (*People v. Rhodes*, *supra*, 126 Cal.App.4th at p. 1389.) The importance of each part depends on the facts of the case. (*People v. Thongvilay* (1998) 62 Cal.App.4th 71, 88.)

2. *Nature of the Offense and the Offender*

As to the first part of the *Lynch* test, oral copulation of a child under the age of 10 years is a heinous act that the Legislature could, and did, determine to warrant a harsh punishment. Oral copulation of a child is far worse than theft of golf clubs worth about $1,200 (*Ewing v. California*, *supra*, 538 U.S. at pp. 18, 20 [upholding 25-year-to-life sentence]), petty theft with a prior theft-related conviction (*Lockyer v. Andrade*, *supra*, 538 U.S. at p. 68 [upholding 25-year-to-life sentence]), or a second conviction for indecent exposure (*Lynch*, *supra*, 8 Cal.3d at pp. 431-433 [striking down life sentence].) Children are particularly vulnerable members of society and "[t]here

19

exists a strong public policy to protect children of tender years." (*People v. Olsen* (1984) 36 Cal.3d 638, 646.) "The fact that the sentence is mandatory merely reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 200-201.)

A statute valid on its face might be unconstitutional as applied. (*People v. Wingo*, *supra*, 14 Cal.3d at p. 180.) The first part of the *Lynch* test incorporates an "as applied" determination by requiring the court to examine the nature of the offender with particular regard to the degree of danger he or she presents to society. (*Lynch*, *supra*, 8 Cal.3d at p. 425.) The nature of the offender is viewed "in the concrete rather than the abstract" as "each offender is necessarily an individual." (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) "This branch of the inquiry therefore focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

In that regard, McPherson argues the 15-year-to-life punishment of section 288.7(b) is unconstitutional as applied to him because he was 57 years old at the time of the offense, had no prior record of sex offenses, and, according to the probation officer, "presented a minimal risk of recidivism." The Legislature was entitled to take a "zero tolerance" approach toward those who commit sex offenses against children (*People v. Alvarado*, *supra*, 87 Cal.App.4th at pp. 200-201), and does not have to take any risk that a sex offender will reoffend, no matter how slim that risk might be. McPherson was a mature adult who suffered no mental, intellectual, or developmental impairments, and violated a position of trust by sexually abusing P.H. while babysitting her. Although the record reflects P.H. suffered no physical harm from his abuse, she did suffer emotional harm. (See *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) She underwent counseling and, several weeks after the crime, wrote in chalk on the patio in

20

front of her home:  "I hate Rob.  I hate living here.  Why did he do this?  Why do we have to move?"  P.H.'s family had to leave the home in which M.H. had lived for 34 years and move to a new home.

McPherson relies on *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez*) as supporting his contention the punishment under section 288.7(b) is grossly disproportionate as applied to him.  The defendant in *Rodriguez* had been convicted of committing a lewd or lascivious act on a child under the age of 14 and sentenced under section 288 to an indeterminate term of one year to life in prison.  (*Rodriguez*, *supra*, at p. 642.)  After serving 22 years of that term, the defendant sought a writ of habeas corpus to obtain his release.  (*Ibid.*)  He argued the indeterminate penalty of one year to life in prison constituted cruel and unusual punishment in violation of the federal and state Constitutions.  (*Id.* at pp. 642-643.)

The California Supreme Court held the indeterminate sentence under section 288 on its face was not unconstitutional.  (*Rodriguez*, *supra*, 14 Cal.3d at p. 648.)  But the court concluded the administration of the indeterminate sentence law, as applied to the defendant, "has resulted in the imposition of cruel and unusual punishment" (*id.* at p. 651) and "the 22 years of imprisonment served by petitioner are excessive and disproportionate punishment" (*id.* at p. 653).  As to the first part of the *Lynch* test, the court noted the offense committed (fondling the private parts of a six-year-old child), though "by no means 'trivial,'" was not committed in a violent manner or with a weapon, lasted only a few minutes, and caused the victim no harm.  (*Rodriguez*, *supra*, at pp. 654-655.)  The defendant was 26 years old when he committed the offense, had an IQ of about 68, and was functionally illiterate and unskilled.  (*Id.* at p. 644, fn. 6.)  The court believed "[h]is conduct was explained in part by his limited intelligence, his frustrations brought on by intellectual and sexual inadequacy, and his inability to cope with these problems."  (*Id.* at p. 655.)  The defendant had no criminal history "apart from problems associated with his sexual maladjustment."  (*Ibid.*)

21

The *Rodriguez* court concluded the 22 years already served by the defendant was disproportionate to the offense considering shorter maximum terms imposed for more serious crimes such as assault with intent to murder, manslaughter, mayhem, assault with intent to commit rape, mayhem, robbery, or sodomy, or arson. (*Rodriguez, supra*, 14 Cal.3d at p. 655.) The *Rodriguez* court conducted a comparison with comparable penal statutes of 45 states, and this comparison revealed a life term was possible in only five states, the maximum penalty was five years in 18 states, and the maximum penalty was 10 years in 14 states. (*Id.* at p. 656.) Because the defendant had already served a term which was disproportionate to the offense, the court concluded his continued imprisonment would constitute cruel and unusual punishment. (*Ibid.*)

*Rodriguez* is readily distinguishable. Unlike the offender in that case, McPherson was 57 years old at the time of the offense, and nothing in the record suggests he has a low IQ, is functionally illiterate or unskilled, or has any developmental impairment or sexual inadequacies. Nor does McPherson argue his conduct could be explained by any of those traits. *Rodriguez*, it must be remembered, did not hold the indeterminate life sentence under section 288 was unconstitutional, but that the 22 years the defendant had served were disproportionate to the offense. The minimum sentence of 15 years imposed against McPherson was far less than the 22 years held to be unconstitutional in *Rodriguez*.

3. *Comparison with Punishments Prescribed for More Serious Offenses*

As to the second part of the *Lynch* test, McPherson makes two arguments. First, he argues section 288.7 is a strict liability crime that encompasses both forcible and nonforcible offenses, as well as limited and extensive contact, but does not permit the trial court to gradate punishment according to culpability. Second, he argues his sentence is excessive when compared to less severe punishments imposed for more serious crimes. He refers to his sentencing brief in the trial court, in which he listed 27 "more serious"

22

crimes subject to lighter sentences than 15 years to life in prison. Among such were other sex crimes against children,[5] some homicides and attempted homicides,[6] child abuse,[7] and sex crimes against adults.[8] In his opening brief, McPherson identifies genital mutilation, which carries a punishment of two, three, five, or seven years in prison. (§§ 273a, subd. (a) (section 273a(a), 273.4.)

But the sentence imposed against McPherson is not disproportionate in comparison to some crimes that do not result in death but result in substantial or even greater sentences than his. (See *People v. Meneses*, *supra*, 193 Cal.App.4th at pp. 1092, 1093-1094 [15 years to life for a defendant convicted of a single lewd act with a 12 year old who became pregnant not cruel and unusual punishment]; *People v. Nichols* (2009)

---

[5] For example: three or more acts of substantial sexual abuse with a child under the age of 14 (§ 288.5, subd. (a) [six, 12, or 16 years in prison]); lewd and lascivious act with a child under the age of 14 with the intent of sexual arousal (§ 288, subd (a) [three, six, or eight years in prison]); lewd and lascivious act on a child under the age of 14 with the intent of sexual arousal committed by force, violence, etc. (§ 288, subd. (b)(1) [five, eight, or 10 years in prison]); and participation in an act of oral copulation of a victim under the age of 14 and more than 10 years younger than the defendant (§ 288a, subd. (c)(1) [three, six, or eight years in prison]).

[6] For example: second degree murder, victim is not a peace officer (§ 190, subds. (a) & (b) [15 years to life in prison]; voluntary manslaughter (§§ 192, subd. (a), 193, subd. (a) [three, six, or 11 years in prison]); gross vehicular manslaughter while intoxicated (§ 191.5, subd. (c)(1) [four, six, or 10 years in prison]); vehicular manslaughter with gross negligence and without alcohol or drugs (§§ 192, subd. (c)(1), 193, subd. (c)(1) [two, four, or six years in prison]); and attempted second degree murder (§§ 189, 664, subd. (a) [five, seven, or nine years in prison]).

[7] For example: physical child abuse under circumstances likely to cause death and actually causing unjustifiable physical and mental suffering (§ 273a, subd. (a) [one year in jail, or two, four, or six years in prison]; and inflicting cruel and inhuman corporal punishment and injury upon a child, resulting in a traumatic condition (§ 273d, subd. (a) [one year in jail, or two, four, or six years in prison]).

[8] For example: rape, including rape by force, violence, or fear of bodily injury (§§ 261, subd. (a)(2), 264, subd. (a) [three, six, or eight years in prison]); and rape in concert (§ 264.1, subd. (a) [five, seven, or nine years in prison]).

23

176 Cal.App.4th 428, 431, 437 [25 years to life for failure to register as a sex offender within five days of moving not cruel and unusual punishment].)

More important than counting up the number of offenses carrying lesser or greater penalties is that in addressing the second part of the *Lynch* test, we must remember the Legislature (or, as the case may be, the electorate) has the responsibility for making normative penological decisions. "The judicial inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.]" (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

The Legislature made such a judgment as to penological approaches when it fixed the sentence for oral copulation of a child under the age of 10 at 15 years to life in prison, by making that a strict liability offense, and by fixing the same punishment for sexual penetration of a child under the age of 10. (§ 288.7(b).) Although section 288.7(b) is a general intent crime, the conduct it criminalizes (oral copulation and sexual penetration) is overtly and unquestionably sexual. Children are particularly vulnerable victims, and "great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses." (*In re Wells* (1975) 46 Cal.App.3d 592, 599.) Oral copulation of a child under the age of 10 is a heinous crime and the fact it carries a punishment the same as or greater than those imposed for other heinous crimes does not make that punishment grossly disproportionate to the offense.

We agree with the Attorney General that the punishment imposed under section 288.7(b) must be viewed in conjunction with section 288a, which gradates punishment based on the age of the victim and of the offender. Under section 288a, subdivision (b)(1), oral copulation of a minor under the age of 18 is punishable as a felony with a prison term or as a misdemeanor with a jail term. Under section 288a,

24

subdivision (b)(2), oral copulation of a child under the age of 16 by an offender over 21 years of age is a felony which, under section 18, subdivision (a), is punishable by a prison term of 16 months, two years, or three years. Under section 288a, subdivision (c)(1), oral copulation of a child under the age of 14 is a felony punishable by a prison term of three, six, or eight years if the offender is more than 10 years older than the victim. Finally, section 288.7(b) imposes a 15-year-to-life sentence for oral copulation of a child who is 10 years of age or younger by a person who is 18 years of age or older. Together, sections 288.7 and 288a create a system whereby punishment increases as the victim's age decreases, with the harshest punishment meted out to adults who orally copulate a child aged 10 or younger. Thus, while section 288.7(b) does not permit gradation of punishment, gradation is built into the overall scheme of which section 288.7 is a part.

4. *Conclusion*

McPherson does not present an argument based on the third part of the *Lynch* test. We conclude the sentence imposed against him, though significant, was not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

### III. McPherson's Sentence of 15 Years to Life Does Not Deny McPherson of Equal Protection of the Laws.

McPherson argues his mandatory indeterminate sentence of 15 years to life in prison under section 288.7(b) denies him equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution.

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522,

25

530.) McPherson contends that defendants who commit assault on a child under eight years of age and inducing coma (§ 273ab, subd. (b) (section 273ab(b)) and defendants who commit mutilation of female genitalia of a child for no medical purpose (§§ 273a(a), 273.4) are such similarly situated groups. He contends the State of California has adopted a classification of punishments that affects him unequally, compared to members of those similarly situated groups, who, he asserts, are punished less harshly for more serious crimes.

"'In resolving equal protection issues, the United States Supreme Court has used three levels of analysis. Distinctions in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest. Classifications based on gender are subject to an intermediate level of review. But most legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose.'" (*In re Smith* (2008) 42 Cal.4th 1251, 1262-1263.)

McPherson does not contend the statutory distinctions involve suspect classifications or classifications based on gender. A defendant does not have a fundamental interest in a specific term of imprisonment, and an equal protection claim of sentencing disparity is judged under the rational basis test. (*People v. Rhodes*, *supra*, 126 Cal.App.4th at p. 1387.) Under the rational basis test, we ask whether the challenged classification bears a rational relationship to a legitimate state purpose or, put another way, whether there is any reasonably conceivable state of facts that could provide a rational basis for the classification. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481-482.)

We question, however, whether McPherson is similarly situated, for equal protection purposes, to defendants who violate section 273ab(b)[9] and defendants who

---

[9] In relevant part, section 273ab(b) states: "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child

26

violate sections 273a(a) and 273.4.[10] McPherson was convicted of orally copulating P.H., an overtly sexual act. Sections 273ab(b), 273a(a), and 273.4, subdivision (a) describe acts of physical violence and brutality. Although oral copulation of a child can have a violent component, particularly when it is conducted forcibly, it is not an act similar to assaulting a child by means of force likely to cause great bodily injury or mutilation of female genitalia. A more apt comparison for equal protection purposes would be with the punishments imposed under section 288a, subdivision (b) for oral copulation with a minor. As we explained above, sections 288a, subdivision (b) and 288.7 create a scheme whereby the punishment for oral copulation is based in part on the defendant's age and increases as the victim's age decreases. There is a rational basis for such differentiation in punishment. Further, defendants who violate section 288.7(b) are similarly situated to those who violate section 288, subdivision (a) (lewd or lascivious act on a child under the age of 14), which carries a punishment of three, six, or eight years in prison. However, the age of the victim justifies the more severe treatment of defendants who violate section 288.7(b), the more serious crime. (See *D.M. v. Department of Justice* (2012) 209 Cal.App.4th 1439, 1451; *People v. Alvarado* (2010) 187 Cal.App.4th 72, 77, 79.)

---

becoming comatose due to brain injury or suffering paralysis of a permanent nature, shall be punished by imprisonment in the state prison for life with the possibility of parole."

[10] Section 273a(a) states: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

Section 273.4, subdivision (a) states: "If the act constituting a felony violation of subdivision (a) of Section 273a was female genital mutilation, as defined in subdivision (b), the defendant shall be punished by an additional term of imprisonment in the state prison for one year, in addition and consecutive to the punishment prescribed by Section 273a."

27

Assuming McPherson is similarly situated to those who violate section 273ab(b) or 273a(a) and section 273.4, we find a rational basis for the distinction in punishment. The punishment under section 273ab(b) is mandatory life imprisonment with the possibility of parole. That, on its face, is as harsh as the mandatory 15-year-to-life sentence under section 288.7(b). McPherson reads into that punishment section 3046, subdivision (a)(1), which provides that a prisoner under a life sentence is eligible for parole after serving at least seven years of the term. Nonetheless, a defendant sentenced under section 273ab(b) faces the same maximum sentence as the defendant sentenced under section 288.7(b).

The punishment for female genital mutilation under sections 273ab(a) and 273.4, subdivision (a) is imprisonment for two, three, five, or seven years, which is substantially lighter than 15 years to life. But female genital mutilation may also be prosecuted as mayhem (§§ 203, 204), aggravated mayhem (§ 205), or torture (§ 206). (§ 273.4, subd. (c).) While the punishment for mayhem is imprisonment for two, four, or eight years (§ 204), the punishment for aggravated mayhem is imprisonment for life with the possibility of parole (§ 205), and the punishment for torture is "prison for a term of life" (§ 206.1).

Thus, the punishments imposed for violating sections 273ab(b) and 273.4 are, or have the potential to be, as severe as that imposed for violating section 288.7. To the extent section 288.7(b) imposes the most severe punishment, there is a rational basis for the classification. The Legislature could plausibly distinguish between those defendants committing overtly sexual acts—oral copulation or sexual penetration—against a child under 10 years of age, and those defendants committing overtly violent and physically brutal acts—assault by deadly force, female genital mutilation—against a child. In addition to the value judgment that sex crimes are more serious than violent crimes, the Legislature could conclude that the risk of recidivism and resistance to rehabilitation justified the harsher sentence for those who violate section 288.7(b). (See

*In re Wells*, *supra*, 46 Cal.App.3d at p. 598 ["some observers consider child molesters, in general, to be more dangerous, harder to rehabilitate, less able to understand or accept their problems, and more inclined to deny their guilt than the average felon is"].)

We conclude McPherson was not denied equal protection of the law.

**DISPOSITION**

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.